UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| VDF FUTURECEUTICALS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| JOSEPH A. LEWIS II; | ) Case No. 1:13-cv-00407 |
| J&J TECHNOLOGIES, LC; and | ) |
| STIEFEL LABORATORIES, INC, | ) Judge John W. Darrah |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

VDF FutureCeuticals, Inc. ("FC") filed an Amended Complaint against Joseph A. Lewis II ("Lewis"); J&J Technologies, LC ("J&J"); and Stiefel Laboratories, Inc. ("Stiefel") (collectively, "Defendants"), on December 14, 2012, in the Circuit Court of Cook County, Illinois. Plaintiff alleges eight claims against Defendants: (I) breach of contract and the duty of good faith and fair dealing against J&J; (II) alter ego liability against Lewis for breach of contract by J&J; (III) alter ego liability against Stiefel for breach of contract by J&J; (IV) unjust enrichment against Lewis; (V) conversion against Lewis; (VI) breach of fiduciary duty against Lewis; (VII) tortious interference with a contract against Stiefel; and (VIII) conspiracy to tortiously interfere with a contract against Lewis, J&J, and Stiefel.

Count I includes multiple alleged breaches. On February 6, 2014, Stiefel and J&J moved for partial summary judgment with respect to certain allegations of breach within Count I; on any tortious interference claim based on these allegations; and to establish a contractual limitation on FC's potential damages. On February 13, 2014, Lewis was granted leave to join Stiefel and J&J's Motion for Partial Summary Judgment. The Motion has been fully briefed.

# BACKGROUND[1]

FC is a cosmetic ingredient manufacturer that sells and holds trademark and patent rights to CoffeeBerry whole coffee fruit materials. (FC's SOF ¶ 1.)[2] J&J is a Virginia limited liability company, formed on July 26, 2004. (FC's SOF ¶ 5.) Lewis was the sole manager of J&J. (*Id.* ¶ 6.) Two months after its formation, J&J entered into a License Agreement with FC. (*Id.*) The License Agreement granted to J&J the exclusive right to develop, make, and sell CoffeeBerry products within the Licensed Territory and Field of Use. (Defs.' SOF ¶ 5; License Agreement § 1.1.) Additionally, J&J was granted the right to sublicense its CoffeeBerry rights to others "in the exercise of [J&J's] sole discretion and judgment." (Defs.' SOF ¶ 6.)

The License Agreement required J&J to pay FC the greater of: (1) running royalties in the amount of 15 percent of J&J's own sales revenue from CoffeeBerry products and J&J's revenue from sublicensing CoffeeBerry products or, alternatively, (2) a minimum royalty payment as defined in the terms of the License Agreement. (*Id.* ¶ 7.) On June 7, 2006, the

---

[1] Local Rule 56.1(a) requires the party moving for summary judgment to provide "a statement of material facts as to which the moving party contends there is no genuine issue" and to cite to the relevant admissible evidence supporting each fact. Local Rule 56.1(b)(3)(B) then requires the nonmoving party to admit or deny each factual statement proffered by the moving party and to concisely designate any material facts that establish a genuine dispute for trial. *Martin v. Gonzalez*, 526 F. App'x 681, 682 (7th Cir. 2013). Under Local Rule 56.1(b)(3)(C), the nonmoving party may file a statement of additional facts and the moving party may submit a concise reply under Local Rule 56.1(a)(3). To the extent that a purported fact is merely a legal conclusion, it is disregarded. *See Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371 (7th Cir. 2008).

A litigant's failure to respond to a Rule 56.1 statement, or to dispute the statement without "specific references to the affidavits, parts of the record, and other supporting material," results in the court's admitting the uncontroverted statement as true. *Banks v. Fuentes*, 545 F. App'x 518, 520 (7th Cir.2013). Similarly, responses containing argumentative denials or extraneous information do not properly dispute a fact. *See Graziano v. Village of Oak Park*, 401 F. Supp. 2d 918, 937 (N.D. Ill. 2005).

[2] Admitted Statements of Fact are designated as either Defendants' ("Defs.' SOF") or FC's ("FC's SOF"), with the corresponding paragraph referenced.

License Agreement was amended for the second time, adding "Contract Payments,"[3] increasing J&J's royalty obligations from 15 percent to 33-1/3 percent, and modifying the schedule of alternative minimum royalties. (*Id.* ¶¶ 15, 17; License Agreement Amend. 2 §§ 2.2, 2.3.) "Contract Payments" are defined as "all fees, Exclusivity Fees and payments of any kind that are not Royalties that are actually collected by the Licensee pursuant to the terms of the [L]icense . . . ." (License Agreement Amend. 2 § 2.3.). J&J was prohibited from assigning or transferring the License Agreement itself, or J&J's rights under the License Agreement, without FC's written consent and approval. (*Id.* ¶ 8; License Agreement § 12.1.) Originally, the License Agreement contained a three-year term[4] with automatic renewal. (*Id.* ¶ 10; License Agreement § 2.1.) J&J had the right to unilaterally terminate the License Agreement upon providing 90-days written notice to FC. (*Id.* ¶ 10; License Agreement § 2.9.)

Stiefel is a Delaware corporation headquartered in North Carolina. (*Id.* ¶ 3.) On May 5, 2006, J&J sublicensed certain of its rights in the License Agreement to Stiefel ("Stiefel Sublicense"), granting Stiefel the right to sell CoffeeBerry products in specified markets for a five-year term. (*Id.* ¶ 11.) The Stiefel Sublicense required Stiefel to pay J&J the greater of: (1) 5 percent of Sitefel's net sales of CoffeeBerry products or (2) an alternative minimum royalty. (*Id.* ¶ 13.)

---

[3] "Contract Payments" are defined as "all fees, Exclusivity Fees and payments of any kind that are not Royalties . . . ." (License Agreement Amend. 2 § 2.3.)
[4] Later amended to a five-year term. (License Agreement Amend. 2 § 2.1.)

On July 1, 2010, Stiefel entered into a Membership Interest Purchase Agreement ("MIPA") to acquire J&J's outstanding membership interests ("Stiefel Transaction"). (*Id*. ¶ 21.)[5] The MIPA listed Joseph DiNardo, and David Stern as "Sellers" of J&J Lewis. (*Id.* ¶ 22.) Stiefel agreed to pay the Sellers $5,666.666.67 and an additional $2,833,333.33 upon receipt of FC's written acknowledgement of the membership change. (*Id.* ¶ 23.) At the time the MIPA was executed, J&J's only assets were the License Agreement, the Stiefel Sublicense, and a sublicense co-exclusive with the Stiefel Sublicense entered into with U.S. CosmeceuTechs ("USC"). (FC's SOF ¶ 18.) In advance of the Stiefel Transaction, Stiefel prepared a memorandum ("Acquisition Memorandum") outlining a number of reasons acquiring J&J would be beneficial. (FC's Supplemental SOF ¶1.) Among these reasons, Stiefel stated that "[t]he existing VDF agreement with JJT does not contain a change in control clause. The proposed transaction has been structured as a purchase of the membership interest rather than an asset purchase agreement as the existing VDF agreement does not require VDF's consent to a change of ownership of JJT." (*Id.* ¶ 6.)

Following the Stiefel Transaction, J&J terminated all of its business operations, and all royalties paid to FC from that point were paid by Stiefel and GlaxoSmithKline ("GSK"), which wholly owns Stiefel. (FC's SOF ¶ 21.) On September 1, 2010, J&J amended the Stiefel Sublicense to reduce the alternative minimum royalty. (Defs.' SOF ¶ 26.) On

---

[5] FC argues in its response to paragraph 21 of Defendants' Statement of Facts, as well as its response to numerous other facts, that the statement should be stricken because it is supported only by "unauthenticated documents and the Complaint." (See FC's Response to Defs.' SOF at 10.) However, FC repeatedly fails to cite any materials that would contradict Defendants' statements, and even asserts that "FC does not dispute for purposes of this Motion only" the stated fact. ( *Id.*) The district court may use its discretion in striking statements of fact that do not strictly comply with local rules. *Peele v. Burch*, 722 F.3d 956, 961 (7th Cir. 2013). Accordingly, only the statements or portions of statements which FC does dispute for purposes of this Motion, and provides support for dispute, are deemed stricken.

September 26, 2012, Stiefel and J&J executed a letter documenting their mutual agreement to terminate the Stiefel Sublicense. (*Id*. ¶ 27.) In a letter dated November 2, 2012, Director of Business Development and Licensing, David L. Saussy, Jr.,[6] wrote that J&J would be terminating the License Agreement on January 1, 2013. (*Id*. ¶ 29.)

Defendants have moved for partial summary judgment with respect to four of the breaches alleged against J&J: (1) failing to pay FC a portion of J&J's proceeds from the MIPA; (2) amending the Stiefel Sublicense to reduce the royalties owed to J&J; (3) failing to collect a termination fee from Stiefel or to pay a portion of that termination fee to FC; and (4) improperly assigning the License Agreement by executing the MIPA. Defendants argue these claims are based on erroneous interpretation of the License Agreement, representing a question of law appropriate for summary judgment.

## LEGAL STANDARD

Summary judgment is appropriate when there remains "no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *See Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012). The party seeking summary judgment must first identify those portions of the record that establish there is no genuine issue of material fact. *U.S. v. King-Vassel*, 728 F.3d 707, 711 (7th Cir. 2013) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). To survive such a showing, the nonmoving party must "present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Tri-Gen Inc. v. Int'l Union of Operating Eng'rs,*

---

[6] It is unclear from the letter for which company Saussy is acting as a director. Although the letter purports to terminate the License Agreement on behalf of J&J, it is composed on Stiefel letterhead.

5

*Local 150, AFL-CIO*, 433 F.3d 1024, 1030-31 (7th Cir. 2006) (citing *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 596 (7th Cir. 1995)). Opposition to summary judgment requires more than a scintilla of evidence or some metaphysical doubt. *Nat'l Inspection Repairs, Inc. v. George S. May Int'l Co.*, 600 F.3d 878, 882 (7th Cir. 2010) (citations omitted). The evidence must be such "that a reasonable jury could return a verdict for the nonmoving party." *Wells v. Coker*, 707 F.3d 756, 760 (7th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

When considering a motion for summary judgment, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010) (citations omitted). The court does not make credibility determinations or weigh conflicting evidence. *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 799 (7th Cir. 2011) (citations omitted). Therefore, issues of contract interpretation are "particularly amenable to summary judgment." *Automation By Design, Inc. v. Raybestos Prods. Co.*, 463 F.3d 749, 753 (7th Cir. 2006).

**ANALYSIS**

As a preliminary matter, FC argues that Stiefel's Motion for Summary Judgment should properly be considered a motion for judgment on the pleadings, pursuant to Rule 12(c), because it was "limit[ed] . . . to matters set forth in the pleadings." (Pl.'s Response at 4.) Further, FC argues that the law of the case was established when the Court denied Lewis's Motion to Dismiss (Dkt. No. 14), which precludes Stiefel from arguing that "nothing prohibit[ed] Lewis from selling his interest in J&J." (Pl.'s Response at 6.)

Yet, a party "may move for summary judgment at any time until 30 days after the close of all discovery." Fed. R. Civ. P. 56(b). "[T]he Seventh Circuit has held that '[t]he fact that

6

discovery is not complete—indeed, has not begun—need not defeat the [summary judgment] motion.'" *Hare v. Custable*, Case No. 07-CV-3742, 2009 WL 3647045, at *4 (N.D. Ill. Aug. 31, 2009) (quoting *Am. Nurses' Ass'n v. State of Ill.*, 783 F.2d 716, 729 (7th Cir. 1986)). Therefore, Stiefel is permitted to submit its undisputed facts to the strict standards of summary judgment. As these facts will be subjected to a different standard than Lewis's Motion to Dismiss, the law of the case regarding summary judgment has not been determined.

Defendants move for summary judgment only as to select allegations within Count I of FC's Amended Complaint: 113(b) The Stiefel Tansaction was an improper assignment or transfer of the License Agreement; 113(d)(i) Stiefel owes FC a share of the amounts paid by Stiefel to J&J in connection with the MIPA; 113(d)(ii) Failing to pay FC its share of the Termination Payment due to J&J as a result of Stiefel's termination of the Stiefel Sublicense; and 113(e) Improperly amending the Stiefel Sublicense to reduce the royalties owed to FC.[7] Defendants also move to limit the amount of damages recoverable by FC. As the forum state in a diversity suit, Illinois supplies the substantive law for this action. *Norem v. Lincoln Benefit Life Co.*, 737 F.3d 1145, 1148 (7th Cir. 2013) (citations omitted).

*Improper Assignment or Transfer of the License Agreement*

The parties agree that the License Agreement prohibited assignment or transfer without FC's consent. Section 12.1 of the License Agreement states in pertinent part:

---

[7] The Amended Complaint alleges that J&J breached the License Agreement in five ways, with two of the breaches containing multiple subparts. (Amd. Compl. ¶ 113.) Without explanation, Defendants choose seven allegations of breach and subparts from the Amended Complaint, restyle each of them, number them (1) through (7), and move for summary judgment only on (1) through (4). For clarity, each of Defendants' (1) through (4) is discussed with its proper citation to the Amended Complaint.

7

> [T]his Agreement and the rights and privileges hereof are otherwise not assignable, or transferable by [J&J] without the written consent and approval of [FC] which shall not be unreasonably withheld.

Defendants argue that the Stiefel Transaction was not an assignment or a transfer, but a "change in control" allowable under the License Agreement. In support of their position, Defendants rely on *Baxter Healthcare Corp. v. O.R. Concepts, Inc.*, 69 F.3d 785 (7th Cir. 1995), and *Ineos Polymers Inc. v. BASF Catalysts*, 553 F.3d 491 (7th Cir. 2009). Both of these cases clearly set out the general rule that a change in ownership of an independent, functioning entity does not constitute an assignment. *Baxter Healthcare*, 69 F.3d at 788; *Ineos*, 553 F.3d at 498-99. Yet, there are distinctions between each of these and the instant case.

In *Baxter*, the defendant's sale of 95 percent of its stock to a Baxter competitor was held to be a change in ownership, not an assignment. However, the Seventh Circuit put particular emphasis on the fact that the defendant, at all times, "remained an independent and functioning organization." *Baxter Healthcare*, 69 F.3d at 788. Defendants focus on this factor, arguing that "[t]he most persuasive demonstration" that J&J maintained a distinct identity was that FC found it proper and was able to sue them. (Defs.' Reply at 7.) This partial quotation omits an important consideration. The complete quotation reads: "The most persuasive demonstration of this is that [the plaintiff] chose [defendant] as the proper party to sue in this action, *not its owners*." *Baxter Healthcare*, 69 F.3d at 788 (emphasis added). Here, FC has also named J&J's new owner, Stiefel, precisely because, FC argues, J&J no longer remains an independent entity. FC's decision to name J&J in this suit is indeed suggestive of J&J's independence, but it is not dispositive.

*Ineos* maintained *Baxter*'s rule that "[a]bsent special circumstances . . . a change in ownership does not affect the contractual obligations of the company, that is, it does not effect an

8

assignment of rights." *Ineos*, 553 F.3d at 499. As set out above, this general rule is not disputed by the parties. In *Ineos*, as in *Baxter*, there was no argument that the defendant failed to maintain an independent presence. Here, FC argues that J&J effectively no longer exists.

However, FC has not presented any facts to dispute J&J's independent existence. FC argues that J&J is, by its own admission, a "privately held shell company." (FC's Supplemental SOF ¶ 3.) Yet, FC provides no law in support of its contention that a shell company cannot be an independent entity. In fact, Stiefel referred to J&J as a shell company *prior to* the acquisition, when there was no assertion J&J was not independent. FC also argues that the Stiefel Transaction was proposed so that Stiefel could "fully control the CoffeeBerry intellectual property . . . ." (FC's Supplemental SOF ¶ 2.) This fact is undisputed, but full control would be a consequence of any complete purchase of membership interests. Without some facts to rebut J&J's continued independent existence, as supported by FC's ability to include J&J as a defendant in this suit, the special circumstances required by *Ineos* and *Baxter* are absent. Therefore, summary judgment is granted as to this issue.

*FC's Claim to a Share of the Amounts Paid by Stiefel to J&J in Connection With the MIPA*

Pursuant to the Second Amendment to the License Agreement, J&J was required to pay FC 33-1/3 percent of all royalties J&J collected from CoffeeBerry related sales. (License Agreement Amend. 2 § 2.2(a).) The Amendment defines royalties as:

> [R]oyalties based on the actual sale of Products by [J&J] or its sublicensees which are actually collected by [J&J]. The term "Royalty" includes advance royalties, pre-paid royalties and payments based on and to be credited against sublicensee(s)' future obligations to pay royalties on actual sales of Products by [J&J] or its sublicensees which are actually collected by [J&J] . . . . The term "advance royalty" shall mean any monies based on and to be credited against sublicensee(s)' future obligations to pay royalties on the actual sale of Products paid by sublicensee(s) to [J&J] prior to any actual sale of Products by

9

>   sublicensee(s) or the due date of such royalties based on the actual sale of Products by sublicensee(s).

(*Id.*) The Amendment also includes a payment to FC of 33 1/3 percent of all contract payments received by J&J, defined as "all fees, Exclusivity fees and payments of any kind that are not royalties that are actually collected by [J&J] pursuant to the terms of the license or sublicense . . . ." (License Agreement Amend. 2 § 2.2(b).) Defendants argue that the money paid to Lewis, DiNardo, and Stern in the Stiefel Transaction does not qualify as either a royalty or contract payment as defined by the License Agreement and, therefore, FC has no claim to any portion of it based on either of these expressed terms.

To the extent that FC claims to the contrary,[8] it argues only that the Stiefel Transaction qualifies as an advance royalty. In support of this proposition, FC focuses on the substance of the Acquisition Memorandum. Specifically, FC cites the fact that Stiefel highlighted the transaction's ability to "*reduce* the royalties and alternative minimums by two-thirds . . . ." (FC's Supplemental SOF, Ex. C at 4 (emphasis added).) However, as FC itself acknowledges, the License Agreement defines an advance royalty as "any monies based on and to be credited against sublicensee(s)' future obligations to pay royalties." Stiefel proposed to eliminate two-thirds of the royalty owed to J&J on any future sale, not pay it up front.

FC has not offered facts that show the money paid in the Stiefel Transaction was "based on and to be credited against future obligations to pay royalties." The contract's language must be given its ordinary meaning. *Quality Oil, Inc. v. Kelley Partners, Inc.*, 657 F.3d 609, 613 (7th Cir. 2011) (citations omitted). It is undisputed that the Stiefel Transaction eliminated future obligations to pay royalties; therefore, it was not an advance royalty as defined in the License

---

[8] FC did not respond to this argument at all in its Response, but only in its Surreply.

10

Agreement. Accordingly, summary judgment is granted in favor of Defendants with respect to FC's claim to a portion of the MIPA proceeds under the Licensing Agreement.

*Commercially Reasonable Efforts*

FC contends that the final two breaches on which Defendants move for summary judgment are both governed by Section 3.2 of the License Agreement, which states that J&J was required "to use commercially reasonable efforts to make, use, sell and otherwise commercialize" CoffeeBerry products.

<u>J&J's Failure to Collect a Termination Payment</u>

The Second Amendment to the Stiefel Sublicense added several new sections to the agreement, including:

> 12.4 Termination for Convenience. Upon 90 days written notice to J & J, Stiefel shall have the right to terminate the [Stiefel Sublicense] for any reason other than in connection with section 12.3. For the avoidance of doubt, J & J has no right to terminate for convenience alone. If Stiefel elects to terminate for convenience, Stiefel shall pay J & J one million dollars ($1 mil) wthin thirty (30) days after such termination for convenience . . . .

(Amd. Compl., Ex. B at 51.) Each party was also afforded the right to terminate for the other's breach, but the contract is silent regarding termination by mutual agreement.

Defendants argue that FC is not entitled to a share of a termination fee because J&J never collected such a fee, but satisfaction of this condition could only be achieved by J&J. "When one party's contractual obligation is 'contingent upon a condition particularly within the power of that party,' the controlling party's discretion in bringing about the condition is limited by the implied covenant of good faith." *Wilson v.*

11

*Career Educ. Corp.*, 729 F.3d 665, 674 (7th Cir. 2013) (quoting *Dayan v. McDonald's Corp.*, 466 N.E.2d 958, 971 (Ill. App. Ct. 1984)). Therefore, if J&J could have collected a termination fee but did not, FC potentially could establish a breach of good faith.

However, Defendants also argue that J&J was not even entitled to a termination fee because J&J and Stiefel terminated the Stiefel Sublicense by mutual agreement. The Stiefel Sublicense allows for termination by Stiefel for convenience or breach, for termination by J&J for breach alone, and is silent with respect to mutual termination. FC disputes whether J&J could have collected a termination from Stiefel, and the factual record does not present a clear answer at this time. Defendants' Motion for Summary Judgment on the issue of a termination fee is denied.

Reduction of the Alternative Minimum Royalty of the Stiefel Sublicense

Similarly, FC asserts that the reduction of the alternative minimum royalty in the Stiefel Sublicense was commercially unreasonable because it benefitted only Stiefel, to the detriment of J&J and FC. In response, Defendants cite *Chicago Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.*, 474 F.3d 463 (7th Cir. 2007). Although that case concerns a similarly worded "commercially reasonable efforts" clause, the clause's application there is distinguishable.

In *Caremark*, the plaintiff executed a contract with the defendants under which the defendants would provide plaintiff's members with prescription drugs at discounted prices. The defendants were able to provide the discount as agreed, but over time were able to negotiate even steeper discounts which they did not pass along to plaintiff. At all times, defendants were able to provide the prices agreed to in the contract. Plaintiff sued for breach based on the defendants' failure to pass through discounts it received from

12

third parties. Plaintiff's claim failed because it still received the bargained for benefit, and a "commercially reasonable efforts" clause cannot be used to renegotiate better terms.

Here, FC attacks the Defendants' dealings with a third party. As a result of the alternative minimum royalty reduction, J&J actually diminished its benefits, and thereby FC's benefits. FC argues that the reduction of the minimum royalty was executed by J&J for no consideration, which may be factually commercially unreasonable. Accordingly, Defendants' Motion for Summary Judgment with respect to the alternative minimum royalty reduction is denied.

*Limitation of Damages*

Finally, Defendants argue that the amount of damages FC can recover in this action is limited by the 90-day notice in the termination for convenience provision and the alternative minimum royalties as negotiated.

The purpose of compensatory damages is to put the non-breaching party in the same position it would have been had the breach not occurred. *Illinois School Dist. Agency v. Pac. Ins. Co. Ltd.*, 571 F.3d 611, 617 (7th Cir. 2009). Had the instant alleged breach not occurred, J&J retained the right to terminate the License Agreement for convenience with a 90-day notice. Therefore, Defendants argue, FC's position could have been improved only by 90 days' worth of future royalties or lost profits. Illinois law holds that the notice period associated with the termination provision of a contract limits the damages to those associated with that period. *See Dunlap v. Alcuin Montessori School*, 698 N.E.2d 574, 578-79 (Ill. App. Ct. 1998). However, FC argues that this general rule cannot apply because the License Agreement provides for the survival of

sublicenses even if J&J terminates for convenience.  The survival of the sublicenses presents a substantial fact issue.

Defendants also argue that the alternative minimum royalty limits recovery in much the same way as the termination notice period.  That is, FC could not reasonably have contemplated any royalties in excess of the alternative minimum.  Defendants rely on *TAS Distrib. Co., Inc. v. Cummins Engine Co., Inc.*, 491 F.3d 625 (7th Cir. 2007), to support the proposition that any amount claimed in excess of the alternative minimum royalty is prohibited.  FC argues that *TAS* is distinguishable because the parties there had completed discovery.  This argument is persuasive.  The Seventh Circuit determined that the plaintiff in *TAS* had "failed to show it was damaged beyond the minimum royalty payments paid by [defendant]."  *Id.* at 637.  FC has not yet been given an opportunity to show such damages.

As a result of disputed material facts regarding damages here, Defendants' Motion to limit the recoverable damages based on the 90-day termination notice and the alternative minimum royalties is denied.

**CONCLUSION**

Defendants' Motion for Summary Judgment is denied in part and granted in part. As set forth above, genuine issues of material fact have been presented with respect to J&J's alleged failure to collect a termination payment, J&J's reduction of the alternative minimum royalty in the Stiefel Sublicense, and the amount of recoverable damages. Accordingly, Defendants' Motion for Summary Judgment is denied regarding these issues. Defendants' Motion for Summary Judgment regarding the proceeds of the MIPA and the alleged assignment of the License Agreement is granted.

Date:     June 25, 2014                    _____
                                           JOHN W. DARRAH
                                           United States District Court Judge